| | | |
|---|---|---|
| JAMES L. MANDRO, | ⋮ | |
| Plaintiff, | ⋮ | CIVIL ACTION NO. |
| | ⋮ | 3:16-CV-1137 (JCH) |
| v. | ⋮ | |
| | ⋮ | |
| NANCY E. BERRYHILL,[1] ACTING | ⋮ | |
| COMMISSIONER OF SOCIAL | ⋮ | |
| SECURITY, U.S.A., | ⋮ | SEPTEMBER 14, 2017 |
| Defendant. | ⋮ | |

**RULING RE: CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER (DOC NOS. 20 & 30)**

## I.  INTRODUCTION

Plaintiff James L Mandro ("Mandro") brings this action under title 42, section 405(g) of the United States Code, appealing from the final determination of the Commissioner of Social Security ("the Commissioner"), which denied his application for Title II disability insurance benefits and Title XVI supplemental security income.  Motion to Reverse the Decision of the Commissioner ("Pl.'s Mot.") (Doc. No. 20).  The Commissioner cross-moves for an order affirming that decision.  Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot.") (Doc. No. 30).

For the reasons set forth below, the Motion to Reverse the Decision of the Commissioner is **GRANTED**, and the Motion for Judgment on the Pleadings is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this decision.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is hereby substituted as the defendant in this case, in place of the former Acting Commissioner of the Social Security Administration, Carolyn W. Colvin.  See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns[ ] or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").  The Clerk of Court is directed to correct the docket to reflect this substituted party.

## II.     PROCEDURAL HISTORY[2]

Mandro first applied for disability insurance benefits on September 30, 3007, and applied for supplemental security income benefits on December 27, 2007.  Both applications claimed an onset date of July 27, 2007.  Both applications were administratively denied on January 17, 2008, and denied again by the Federal Reviewing Office on September 10, 2008.  Mandro requested a hearing on October 20, 2008.  On February 18, 2010, a hearing was held before Administrative Law Judge ("ALJ") Robert A. DiBiccaro.  On July 23, 2010, ALJ DiBiccaro issued a decision denying Mandro's claims in full.  In that decision, ALJ DiBiccaro concluded that Mandro could no longer perform his past relevant work as a bus driver because "[t]he demands of the claimant's past relevant work exceed his residual functional capacity."  Certified Transcript of Record ("R.") at 174.  However, ALJ DiBiccaro concluded that Mandro "has the residual functional capacity to lift and carry 10 pounds occasionally and nominal weight frequently; he can walk and/or stand for up to 2 hours of an 8-hour workday; and he can sit for approximately 6 hours of an 8-hour workday."  Id. at 171.  In addition, ALJ DiBiccaro concluded that Mandro was "limited to only occasional use of foot controls."  Id.  Mandro did not appeal ALJ DiBiccaro's 2010 decision.

On June 8, 2011, Mandro filed new applications for social security benefits, once again claiming an onset date of disability of July 26, 2007.  Id. at 367, 376.  The applications were denied initially on July 13, 2011, id. at 181–88, and then denied upon reconsideration on January 18, 2012, id. at 192–97.  Mandro filed a request for a

---

[2] The facts set forth herein are derived from Mandro's Statement of Facts (Doc. No. 20-1), to which the Commissioner stipulated, Defendant's Memorandum at 2, unless otherwise noted.

hearing on January 24, 2012, which took place—once again before ALJ DiBicarro—on January 31, 2013. At the hearing, Mandro testified that he experienced severe pain for hours every day, and that his feet were constantly numb. Id. at 73. He testified that he had allowed his license to expire three years before, and had been physically unable to drive for the prior two years because of numbness in his feet. Id. at 44–45. He also testified that he had developed a dependence on opiate pain relievers, and had been attending therapy and taking methadone since mid-2012. Id. at 45–47.

On April 16, 2013, ALJ DiBiccaro issued a partially favorable decision, finding that Mandro had been disabled since April 10, 2011, but not before. Id. at 137–58. ALJ DiBiccaro found that, since April 10, 2011, Mandro had the residual function capacity to perform sedentary work, with the additional limitations that "the claimant is able to walk less than two hours and sit less than four hours in an eight-hour workday." Id. at 150. With respect to Mandro's past work as a bus driver, ALJ DiBiccaro stated that bus driving is medium work, and therefore concluded that Mandro was unable to perform his past relevant work. Id. at 151.

On June 12, 2013, the Social Security Appeals Council notified Mandro of the possibility that the Appeals Council planned to "set aside the favorable hearing decision and send your case back to an Administrative Law Judge for more action and a new decision." Id. at 262. On November 1, 2013, the Appeals Council vacated ALJ DiBiccaro's April 16, 2013 decision and remanded the claim to the New Haven Office of Disability Adjudication and Review for a new hearing, decision, and order. Id. at 159–63. In so doing, the Appeals Council directed the ALJ to "offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative

record and issue a new decision." Id. at 162. The Appeals Council specifically directed the ALJ to "[r]e-assess the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." Id. To that end, the Notice direct the ALJ to "re-evaluate the medical source opinion evidence" and further stated that, "[a]s appropriate, the Administrative Law Judge may request the treating source(s) to provide additional evidence and/or further clarification of the opinion(s) and updated medical source statements about what the claimant can still do despite the impairments." Id. The Appeals Council further stated that the ALJ "may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources." Id.

On remand, the matter was assigned to ALJ Matthew Kuperstein, and hearing was scheduled for December 17, 2014. The transcript from that date reflects that Mandro's representative, Attorney Allan Rubenstein, was present, but Mandro himself was not. Apparently Mandro was present at the hearing office on the day of the hearing, but reported to hearing office staff that he was having a panic attack, and he left before Attorney Rubenstein arrived. Id. at 11. ALJ Kuperstein agreed to postpone the hearing at that time. Id. at 80. ALJ Kuperstein also informed Attorney Rubenstein on the record during the December 17, 2014 hearing that the record was missing updated treatment notes from physicians Glenn Vitale, D.P.M, and Elvin Griffith, M.D., and requested that Attorney Rubenstein produce records since November 19, 2012. Id. Attorney Rubenstein informed ALJ Kuperstein that he had "had difficulty" getting records. Id. at 81.

The hearing was rescheduled for May 19, 2012, but in February, 2012 Attorney Rubenstein informed the hearing office that he would be unavailable on that date, and requested that the hearing be postponed. Id. at 340. The hearing was subsequently rescheduled for September 9, 2015. On September 8, 2015, Attorney Rubenstein notified the hearing office by letter and by phone that Mandro was "suffering from a stomach virus, a fever and emesis" and he would therefore be unable to attend the September 19, 2015 hearing. Id. at 366.

The transcript of the September 9, 2015 hearing apparently begins in the middle of what could euphemistically be called a discussion between ALJ Kuperstein and Attorney Rubenstein. In essence, ALJ Kuperstein decided not to postpone the hearing despite Mandro's absence, and Attorney Rubenstein vigorously objected to that decision. R. at 87. The result of this dispute was that Attorney Rubenstein walked out of the hearing, and ALJ Kuperstein took the testimony of Vocational Expert Ruth Baruch, who appeared telephonically, in the absence of either Mandro or his representative. Id. at 88–96.

On November 18, 2015 ALJ Kuperstein issued an unfavorable decision, denying Mandro's applications in their entirety. With respect to the period from July 26, 2007 through July 23, 2010, ALJ Kuperstein concluded that res judicata barred Mandro's claims based on ALJ DiBicarro's unfavorable ruling from July 23, 2010. Id. at 12. ALJ Kuperstein further found that, since July 24, 2010, Mandro had "the residual functional capacity to perform light work . . . except: The claimant is limited to only occasional climbing of ramps or stairs and occasional balancing, stopping, kneeling, crouching or crawling." Id. at 17. ALJ Kuperstein further found that Mandro "is limited to never being

able to do work that involves the climbing of ladders, ropes, or scaffolds." Id.  Given this

residual functional capacity finding, ALJ Kuperstein concluded that Mandro could still

perform his relevant past work driving a bus "as actually performed."  Id. at 21.

Mandro requested review by the Appeals Council on November 24, 2015, and on

May 13, 2016, the Appeals Council denied his request.  Id. at 1–5.  By virtue of that

denial, ALJ Kuperstein's November 18, 2015 decision became a final decision

reviewable by this court.

## III.   FACTS

The court adopts the facts as stated in the Plaintiff's Statement of Facts (Doc.

No. 20-1), to which the Commissioner stipulated, see Defendant's Memorandum (Doc.

No. 30-1) at 2.  Mandro was born in 1964, making him forty-three-years-old on his

alleged onset date of July 26, 2007, and fifty-one-years-old when his most recent

application was denied, on December 18, 2015.  Mandro holds a high school diploma,

and worked as a bus driver until his alleged onset date.  In both his initial application for

benefits and his subsequent application, Mandro alleged disability based on bulging

discs, back spasms, and arthritis in his back.  According to treatment notes from

Mandro's treating physician, Dr. Griffith, Mandro has been diagnosed with mixed

hyperlipidemia, obesity, lumbago, hypertension, and type II diabetes, see R. at 663

(treatment notes dated March 9, 2011), as well as peripheral vascular disease, see id.

at 667.  A medical source statement by Dr. Griffith dated December 11, 2014, states

that Mandro's diagnoses include type II diabetes, hypertension, peripheral neuropathy,

mixed hyperlipidemia, reflex esophagitis, and fibromyalgia.  Id. at 1403.  Mandro has

also been treated by podiatrist Glenn Vitale for plantar fasciitis.  See id. at 1407–16

(treatment notes by Dr. Glenn Vitale from September 28, 2012 through October 10,

2014).  Generally, Mandro alleges disability consisting of chronic back pain, pain in his legs and feet, and numbness in his feet secondary to type II diabetes.

The record reflects that Mandro was suspected of drug seeking behaviors by physicians on several occasions between 2007 and 2012, see, e.g., id. at 826, and that Mandro eventually sought treatment for a dependence on prescription painkillers, id. at 1138–41.  The record further indicates that Mandro has been taking methadone since seeking treatment, and between May 16, 2012 and August 12, 2015, has passed regular urine screenings with only one exception.  Id. at 1446.[3]

## IV.  STANDARD OF REVIEW

Under title 42, section 405(g) of the United States Code, it is not the district court's function to determine de novo whether the claimant was disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court is limited to two lines of inquiry: whether the ALJ applied the correct legal standard, and whether the record contains "substantial evidence" to support his decision.  See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).  "Substantial evidence" requires "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

## V.  ANALYSIS

### A.  ALJ Kuperstein's Finding of Constructive Waiver of Appearance at September, 2015 Hearing

As described in the Procedural History section, Mandro did not appear at the

---

[3] On May 27, 2015, Mandro tested positive for opiates.  He informed his counselor that he was prescribed Vicadin for dental pain.  R. at 1421.

hearing scheduled for September 9, 2015. His representative, Attorney Rubenstein, called the Social Security Administration hearing office on September 8, 2015, to alert the office and ALJ Kuperstein to his client's illness. R. at 476. On September 9, 2015, although Mandro did not appear, Attorney Rubenstein was present. However, he objected to ALJ Kuperstein's decision to go forward with the hearing in Mandro's absence, and left before the Baruch's testimony was taken. Id. at 88.

Mandro argues that, because ALJ Kuperstein failed to postpone Mandro's hearing or schedule a supplemental hearing, ALJ Kuperstein's December 18, 2015 Ruling was "facially prejudicial to [Mandro], and requires remand." Plaintiff's Memorandum in Support of his Motion ("Pl.'s Mem.") (Doc. No. 20-2) at 8. In support of this argument, Mandro points to both the internal policies of the Social Security Administration as well as the Mandro's statutory and constitutional right to procedural due process.

In his decision denying Mandro's applications, ALJ Kuperstein states that, because Mandro did not appear at the hearing and did not provide documentation from medical sources explaining his absence, Mandro "constructively waived his right to appear . . . at [sic] hearing." R. at 12. Social security hearing procedures are governed by the Hearings, Appeals and Litigation Law Manual ("HALLEX"). Volume I, Section 2-4-25 of HALLEX states that a claimant constructively waives his right to appear at a hearing under certain limited circumstances. First, if a claimant fails to appear for a hearing but the claimant's representative does appear and continues to represent the claimant, "the ALJ may determine that the claimant has constructively waived the right to appear at the hearing if . . . [t]he representative is unable to locate the claimant" and

certain other conditions apply.  HALLEX I-2-4-25(D)(2)(a).[4]  Here, as Mandro points out,

Attorney Rubenstein was not "unable to locate the claimant."  Defendant's

Memorandum in Support of her Motion ("Def.'s Mem.") (Doc. No. 20-2) at 5.  Therefore,

Mandro did not constructively waive his right to appear at a hearing pursuant to

HALLEX I-2-4-25(D)(2)(a).

    In the event that the necessary conditions for constructive waiver under that

provision are not met, HALLEX directs:

> the ALJ may choose to proceed with the hearing, accepting
> the testimony of the witness(es) and allowing the appointed
> representative to question the witness(es) and make
> arguments on the claimant's behalf.  The ALJ will advise the
> appointed representative that a Request to Show Cause for
> Failure to Appear will be sent to the claimant to ask why he or
> she did not appear at the scheduled hearing and whether a
> supplemental hearing should be held.   After the 10-day
> response period expires (with an additional five days for
> mailing time), the ALJ will either:
>
> - Determine that the claimant has constructively waived
>   his or her right to appear for a hearing (if the claimant
>   fails to respond to the Request to Show Cause for
>   Failure to Appear or fails to show good cause for failure
>   to appear at the scheduled hearing), and issue a
>   decision based on the evidence of record; or
>
> - Offer the claimant a supplemental hearing to provide
>   testimony if the claimant establishes good cause for
>   failure to appear at the scheduled hearing.

HALLEX I-2-4-25(D)(2)(b).

---

[4] The court recognizes that, at least arguably, the facts of this case do not map neatly onto any of the situations addressed in HALLEX, because Mandro's representative arguably did not "continue to represent the claimant during the hearing" in the literal sense, albeit while continuing to be Mandro's attorney.  On the other hand, in the context of Section I-2-4-25 as a whole, the logical meaning of the phrase "continue to represent" is merely that counsel did not withdraw as a representative, given that the preceding subpart addresses circumstances in which "Representative Withdraws From Representing the Claimant at the Hearing."  HALLEX I-2-4-25(D)(1).  Under such an interpretation, the court concludes that this case is governed by I-2-4-25(D)(2).

Neither ALJ Kuperstein's decision of November 18, 2015 nor the record evidence suggests that ALJ Kuperstein sent Mandro a Request to Show Cause. In his written decision, ALJ Kuperstein notes the following:

> [A]t the claimant's hearing, the claimant's attorney was reminded at the September 9, 2015 hearing that he could send information to me after the hearing as to why his client was not at this hearing. Nevertheless, over two months have passed since the claimant's September 9, 2015 hearing and no further treatment notes from any treating source has been provided by the claimant or his representative to explain why the claimant was not available for his September 9, 2015 hearing or to further support the claimant's alleged impairments. Accordingly, the claimant has constructively waived his right to appear . . . at [sic] hearing.

In short, ALJ Kuperstein placed the burden on Mandro to come forward with evidence to support his absence at the September 9, 2015 hearing. HALLEX, however, demands that the ALJ take the affirmative step of sending the claimant an order to show cause and, if good cause is shown, that the ALJ offer the claimant an opportunity for a supplemental hearing. The court recognizes that Attorney Rubenstein, who represented to the hearing office on September 8, 2015, that documentation would be forthcoming, may have been granted a supplemental hearing for his client simply by following through and providing that documentation. Nevertheless, under the circumstances, HALLEX clearly places the burden on ALJ Kuperstein to develop good cause and Attorney Rubenstein's underwhelming performance on this matter does not alter that responsibility.

The Commissioner argues that ALJ Kuperstein was not obligated to send an Order to Show Cause because, "Plaintiff's counsel already alerted the ALJ to the alleged reason Plaintiff did not attend the hearing." Def.'s Mem. at 34. First, the court is skeptical that the unequivocal mandate of HALLEX that "[t]he ALJ <u>will</u> advise the

appointed representative that a Request to Show Cause for Failure to Appear will be sent to the claimant to ask why he or she did not appear at the scheduled hearing" can be read out of the provision whenever a representative provides an explanation for his or her client's absence, particularly since a different, mutually exclusive provision applies to circumstances in which a representative is unable to locate his or her client. Compare HALLEX I-2-4-25(D)(2)(a) (emphasis added) with HALLEX I-2-4-25(D)(2)(b).

Even assuming, however, that under some circumstances HALLEX's requirement of an Order to Show Cause is rendered unnecessary by the representations of counsel, here the ALJ did not provide to counsel in person the information that was contained in the form. As analyzed above, ALJ Kuperstein simply concluded that, without corroborating evidence to support the illness alleged, Mandro had not shown good cause for his absence. The form that HALLEX directs ALJs to send in order to develop good cause, Form HA-L90, directs the recipient to "[a]ttach all supporting documentation." Although ALJ Kuperstein stated that Attorney Rubenstein could send "more information" after the hearing, ALJ Kuperstein did not request specific documentation, nor did he inform Attorney Rubenstein that, if he submitted supporting documentation, a supplementary hearing might be granted, or that if he failed to submit documentation ALJ Kuperstein might enter a ruling without it. In fact, the best reading of ALJ Kuperstein's statements to Attorney Rubenstein suggest that ALJ Kuperstein did not intend to postpone the hearing or offer a supplementary hearing regardless of the documentation provided. The following occurred during the September 9, 2015 hearing:

> ALJ: Okay. Counsel, we're getting ready to start the hearing.
>
> Atty: I will not stay in a hearing where my client is not here because he is sick.

> ALJ: Counsel, we can address that after the hearing. You can send me information —
>
> Atty: Have a nice day.

R. at 88. Attorney Rubenstein left the courtroom after making this statement. Thus, while Attorney Rubenstein was arguably on notice that he would be permitted to send additional information to ALJ Kuperstein—though it is difficult to say with confidence that he heard ALJ Kuperstein's statement, given that he was apparently walking out of the room—ALJ Kuperstein did not demand that Attorney Rubenstein provide supporting documentation to justify Mandro's absence, or explain what purpose that information would serve. Since ALJ Kuperstein neither accepted Attorney Rubenstein's representations for the purposes of a good cause analysis nor provided him with all the same information that would have been available in an Order to Show Cause, the court cannot conclude that ALJ Kuperstein constructively satisfied the obligations of HALLEX I-2-4-25(D)(2)(b).

Mandro argues that HALLEX policies have the force of law under the circumstances presented by this case. As another judge in this District has written, HALLEX policies have the force of law "when they accord with or are more demanding than the statute or its regulations," but "where HALLEX policies authorize procedures not addressed in the regulations or statute, they do not have the force of law." Edwards v. Astrue, 3:10cv1017 (MRK), 2011 WL 3490024, at *6 (D. Conn. Aug. 10, 2011). Here, title 20, section 404.936 of the Code of Federal Regulations governs situations in which claimants request a continuance of their hearing for good cause. 20 CFR § 404.936(f). The procedures laid out in HALLEX therefore do not "authorize procedures not addressed in the regulations or statute," but are instead in the category of procedures

which are "more demanding than the statute or its regulations." Edwards, 2011 WL 3490024, at *6. Therefore, the court agrees with Mandro's argument that the HALLEX provision at issue has the force of law. Because HALLEX I-2-4-25(D)(2) has the force of law in this context, and because ALJ Kuperstein did not follow the mandatory procedure dictated by that provision, the court concludes that ALJ Kuperstein committed legal error, which deprived Mandro of the full and fair hearing guaranteed to him by the Social Security Act. The court remands the matter to the Commissioner for further proceedings consistent with that decision.[5]

This conclusion is consistent with Mandro's statutory and constitutional procedural due process rights. Mandro is guaranteed a "full hearing under the [Commissioner's] regulations and in accordance with the beneficent purpose of the [Social Security] Act." Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982). Furthermore, the Supreme Court has held, in the context of a social security benefits decision, that due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)); see also Yancey v.

---

[5] In so deciding, the court recognizes that at least one other district court in the Second Circuit has held that the claimant's due process rights were sufficiently protected when the claimant's representative explained her absence to the ALJ, without an order to show cause issuing. See Carpenter v. Colvin, No. 5:13-cv-859 (GLS), 2014 WL 4637085, at *2 (N.D.N.Y. Sept. 16, 2014). However, in that case the ALJ had heard testimony from the claimant during an initial hearing, and also concluded, based on the record evidence, that the claimant was not prejudiced by the lack of testimony. Id. at **1, 3.

As the following analysis reflects, the court finds neither of those conditions exist here and concludes that Carpenter is materially distinguishable. Furthermore, to the extent that Carpenter exempts ALJs from following their own published procedures on the basis that "administrative hearings are to be 'informal,' 'liberal,' and 'not strict in tone and operation,'" this court is unpersuaded. Id. at *2. While the process due to social security claimants is, without question, something less than that provided in judicial trials, this court is of the view that the Carpenter opinion overstates the extent to which hearing procedures are subject to the ALJ's discretion. Id.

Apfel, 145 F.3d 106, 112 (2d Cir. 1998) ("Generally, due process requires that a social security disability hearing must be full and fair."). Because Mandro neither testified at a hearing in front of ALJ Kuperstein nor constructively waived his right to be present, Mandro's procedural due process rights were violated.

The Commissioner argues that Mandro's rights were not violated because "Plaintiff already testified at length about his impairments at the January 2013 hearing before ALJ DiBicarro." Def.'s Mem. at 34. In support of this argument, the Commissioner cites Carpenter v. Colvin, No. 5:13-cv-859 (GLS), 2014 WL 4637085 (N.D.N.Y. Sept. 16, 2014). However, Carpenter is materially distinguishable from this case because the initial hearing at issue in that case was in front of the same ALJ. Furthermore, ALJ Kuperstein did not cite or reference any of Mandro's January 2013 testimony. In fact, it is not clear that ALJ Kuperstein was even aware that Mandro had testified before ALJ DiBicarro in 2013, or that ALJ DiBicarro issued a partially favorable decision on Mandro's 2011 applications. ALJ Kuperstein's description of the procedural history of the case states that Mandro's June 8, 2011 application was "denied initially, upon reconsideration, and in an unfavorable hearing decision dated July 23, 2010," and that the 2010 decision was then vacated and remanded to ALJ Kuperstein. R. at 11. This is clearly error on ALJ Kuperstein's part, because a 2011 application could not have been denied in 2010. However, ALJ Kuperstein subsequently states that res judicata applies to Mandro's claims of disability prior to July 24, 2010, which would be— and is—true only if the July 23, 2010 denial were final. In other words, if ALJ Kuperstein erroneously believed that he had before him the application denied on July 23, 2010, res judicata clearly would not apply. Therefore, while the best reading of ALJ

Kuperstein's scrambled procedural history is that it was scrivener's error to some extent, it is nevertheless unclear whether ALJ Kuperstein knew of Mandro's January 2013 testimony or ALJ DiBicarro's decision.

In his April 16, 2013 decision, ALJ DiBiccaro wrote that Mandro "appeared to be in physical discomfort" during the January 13, 2013 hearing. R. at 151. He further noted that Mandro "credibly reports limitations in his ability to stand and walk for prolonged periods and testified that he relies on others for assistance with daily activities." Id. Although he did not explicitly credit Mandro's testimony with respect to his ability to drive, he generally stated that, "beginning on April 10, 2011, the claimant's allegations regarding his symptoms and limitations are generally credible." Id. at 150. He also noted that Mandro's testimony that he had not been able to drive for the two years preceding the January 13 2013 hearing was consistent with objective medical evidence. Id. at 149. None of this was reflected in ALJ Kuperstein's December 2015 decision.

Of course, ALJ Kuperstein is not bound by the findings of ALJ DiBiccaro; to the contrary, the Social Security Administration's Appeals Council explicitly mandated that ALJ Kuperstein should "[r]e-assess the claimant's maximum residual functional capacity," and in so doing required ALJ Kuperstein to "offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." Id. at 162. There can be little question, therefore, that ALJ Kuperstein was not expected to adopt ALJ DiBiccaro's findings of fact from the January 13, 2013 hearing. However, given that ALJ Kuperstein was neither expected to accept ALJ DiBiccaro's findings nor in fact did accept them, the January 2013 hearing is not

relevant to determining whether Mandro received the full and fair hearing he is due. Therefore, the fact that Mandro testified before a different ALJ in January, 2013 does not alter the court's decision to remand this case for a hearing that Mandro can attend.

Because the court is remanding this matter to the ALJ for the purpose of providing Mandro with due process, the court need not reach the additional arguments raised by Mandro in his Motion to Reverse. However, the court is mindful of the fact that Mandro submitted the application at issue in this matter in 2011. Therefore, in an effort to resolve this matter as efficiently as possible, the court will address Mandro's other claims.

B.    <u>Treating Physician Rule</u>

Mandro argues that ALJ Kuperstein erred in concluding that Mandro's evaluations were "generally normal," and therefore did not support his medical source report. Pl.'s Mem. at 8–10. Mandro also argues that ALJ Kuperstein failed to give proper deference to Mandro's treating physician, Dr. Griffith, and erred in giving "great weight" to the report of the consulting expert. <u>Id.</u> at 10–12.

ALJ Kuperstein supports his decision to give little weight to Dr. Griffith's opinion statement primarily by citing to evidence in the record which indicates normal examinations. He cites medical record evidence from 2010 and 2011, which reflects that Mandro complained of chronic back pain, among other health problems, and was diagnosed with lumbago, but reflects generally normal physical examinations. <u>See</u> R. at 556–63 (treatment notes of Dr. Griffith, from March 9, 2011 to April 22, 2011); <u>id.</u> at 638–81 (treatment notes of Dr. Griffith, from November 3, 2010 to November 20, 2011). However, as ALJ Kuperstein himself notes, the record is missing years' worth of

medical records from Dr. Griffith.[6]  Id. at 21.  Indeed, the most recent of Dr. Griffith's treatment notes in the record were apparently faxed from Dr. Griffith's office on December 5, 2011.  See id. at 638–81.

Given this gap in the treatment record, the court cannot say that ALJ Kuperstein was incorrect in his conclusion that Dr. Griffith's 2014 medical source statement was "unsupported by his treatment notes."  Id. at 21.  However, given that there are not any treatment notes in the record from Dr. Griffith for the roughly four years preceding ALJ Kuperstein's decision, the more important problem is that there is a significant gap in the medical record.  In the absence of updated treatment notes, neither this court nor the ALJ can meaningfully assess whether Dr. Griffith's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record," as the treating physician rule demands.  20 C.F.R. § 404.1527(c)(2).

The court recognizes that Mandro bears the burden of proof with respect to his social security claim, with the limited exception of the availability of positions at step five of the analysis.  See 20 C.F.R. § 404.1520 (outlining the five-step evaluation).  In an ordinary, adversarial system the party who bears the burden would pay the price for failure to provide adequate evidence.  Social security disability proceedings, however, are not adversarial in nature.  See Echevarria, 685 F.2d at 755.  In this context, "the ALJ, unlike a judge in a trial, must himself affirmatively develop the record."  Id.

---

[6] Specifically, ALJ Kuperstein stated that Dr. Griffith's 2014 medical source statement "is unsupported by his treatment notes from 2011 and 2012, indicating generally normal physical examinations, and there were no additional treatment notes provided for this clinician to support his statements."  R. at 21.  In fact, the most recent treatment notes provided by Dr. Griffith are from 2011.

Although this obligation is heightened where the plaintiff is <u>pro se</u>, <u>id.</u>, the obligation exists "even when . . . the claimant is represented by counsel." <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996). In this case, of course, Mandro was represented by an attorney. Nevertheless, ALJ Kuperstein had an obligation to develop the record, particularly where, as here, the lack of treatment notes led the ALJ to give little weight to the opinion of Mandro's treating physician. As then-Judge Sotomayor wrote for the Second Circuit:

> [A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel . . . .'

<u>Rosa</u>, 168 F.3d at 79 (internal citations omitted) (quoting <u>Perez v. Chater</u>, 77 F.3d 41, 74 (2d Cir. 1996)). The ALJ therefore had an obligation to make reasonable efforts to fill the gaps in the record.

In addition, ALJ Kuperstein was aware that Attorney Rubenstein was having difficulty developing the record. For example, during the aborted December 17, 2014 hearing, the following occurred on the record:

> ALJ: Okay. So then we will — I'll be postponing the hearing, but before I do that I want to just go over a couple of issues. I'd like to get this resolved before the next hearing. I know I did see a letter from your office today.[7] It still has not been exhibited, Mr. Rubenstein. In any case, that Mr. Mandro currently sees Glenn Vitale, D.P.M. and Elvin Griffith, M.D. and I don't have any treatment notes since November 19, 2012 from any of these doctors. So if you could, go through

---

[7] The letter, dated December 17, 2014, informs ALJ Kuperstein that Attorney Rubenstein's office had requested Mandro's medical records since January 1, 2012, from both Dr. Vitale and Dr. Griffith on November 10, 2014. R. at 470. The letter goes on to state that a legal assistant "spoke with Dr. Griffith's office this morning and was told that the requested records had been printed out but not yet mailed" and that Attorney Rubenstein's office was still awaiting those records as of December 17, 2014. <u>Id.</u>

the record and prior to the next hearing please complete the
record with whatever treatment notes we don't have of the
treatment that he's had. That's what I need. And if for some
reason you have difficulty and you need my assistance then
please let me know about that. . . .

Atty: So in terms of your assistance, if we have difficulty, you
would issue a subpoena?

ALJ: If you're not able to obtain these records.

Atty: We've had difficulty.

ALJ: Okay.

R. at 80–82. Despite this discussion, there is no indication in the record that Attorney
Rubenstein took measures to obtain a subpoena or otherwise enlist the help of the court
in developing the record. If Attorney Rubenstein had petitioned ALJ Kuperstein for
assistance obtaining medical records, this problem may have been avoided altogether.

Nevertheless, ALJ Kuperstein had a responsibility to develop the record and
should have taken reasonable measures to do so. For example, in Rosa v. Callahan,
the Second Circuit concluded that, where the ALJ rejected a treating physician's opinion
for lack of support, "the ALJ should have taken steps directing Rosa to ask [the treating
physician] to supplement his findings with additional information," and should have
"obtain[ed] or attempt[ed] to obtain the records of a number of other physicians
identified by Rosa." 168 F.3d at 80–81. Like the Court of Appeals concluded in that
case, here "[i]t is entirely possible that [the physician], '[i]f asked,' could have provided a
sufficient explanation for any seeming lack of support for his ultimate diagnosis of
complete disability." Id. at 80.

As stated above, the court is remanding this case to the Commissioner to provide
Mandro with the full and fair hearing that he is due. In addition, the ALJ should make

19

reasonable efforts to fully develop the medical record. To that end, the court notes that, in addition to obtaining Dr. Griffith's treatment notes since December, 2011, the Commissioner may benefit from a more detailed—not to mention updated—medical opinion statement from Dr. Griffith as well.

     C.     Support for ALJ Kuperstein's Vocational Findings

As described in the Procedural History section, at step four of the five-step analysis ALJ Kuperstein concluded that Mandro could perform his previous work as a bus driver "as actually performed." R. at 21; see 20 C.F.R. § 404.1560(b)(2) (advising applicants that vocational experts may offer evidence "concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy"). This inquiry requires determining how a claimant performed his or her work, and whether, given the residual functional capacity finding, the claimant is still capable of performing such work. Unlike the analysis at step five, a step-four finding does not include an assessment of whether the past relevant work in question still exists in the national economy, or whether the claimant could feasibly obtain such a position. See 20 CFR § 404.1560(b)(3).

Mandro argues that the testimony of the Vocational Expert, Ruth Baruch, lacks support with respect to how Mandro actually performed his job as a bus driver because the "Work History Report" that Baruch relied on "contains absolutely no information whatsoever to indicate who completed [it]" and "there is nothing in the Record by which its reliability may be tested." Pl.'s Mem. (Doc. No. 20-2) at 15; R. at 422–28. However, as the Commissioner accurately observes, another document in the Record contains substantially the same description of the exertional requirements of Mandro's past

relevant work. Def.'s Mem. at 31; R. at 417–18. Because the court concludes that ALJ

Kuperstein's step-four determination lacked substantial evidence on a different basis,

the court assumes without deciding that the description of bus driving contained in the

Work History Report on which ALJ Kuperstein and Baruch relied can be ascribed to

Mandro.

Mandro argues that the ALJ should not have relied on Baruch's testimony

because Baruch herself expressed doubts about her ability to opine as to Mandro's

previous work. During the September 9, 2015 hearing, the following occurred:

> Q: Now do you have enough information in the record to
> determine whether or not the work was actually performed by
> the claimant at this level or another level?
>
> A: Well, the only thing that I have, Your Honor — so I don't
> feel comfortable saying that I definitely have enough
> information here — is he says he drove a bus and he says he
> sat all day, but that he lifted — he said no lifting, less than ten
> pounds. So potentially it could have been performed in light
> as this individual did this work. Now it also would be unfair for
> me to say that I'm sure that he was — what type of bus he
> was driving. So I don't know for sure if I have enough
> information based on what I have available to me.

R. at 90. Despite her expressed uncertainty with respect to critical facts about Mandro's

actual work as a bus driver, Baruch went on to answer ALJ Kuperstein's hypothetical

questions. Asked whether a person "limited to light exertional work with the further

limitation to only occasional climbing of ramps or stairs, balancing, stooping, kneeling,

crouching, or crawling" who "would never be able to do work that involved the climbing

of ladders, ropes, or scaffolds" could perform Mandro's past relevant work, she

answered that "[a]s performed by him he should be able to do the work. As generally

performed in the national economy [bus driving] is medium [work] and so based on that

he would not be able to do the work." Id. at 92.

In his Decision, ALJ Kuperstein relied heavily on Baruch's testimony.  Id. at 21 (citing Baruch's testimony "that the claimant sat all day but . . . lifted no less than ten pounds" and "the claimant would still be able to do this past relevant work as he actually performed it").  Yet underlying Baruch's testimony and, by extension, the ALJ's Decision, were two pages of a fill-in-the-blank style form that does not require a detailed explanation as to why the claimant is no longer in said position, or whether the claimant can still perform the work demanded.[8]  Not surprisingly, the fill-in-the-blank options are far from comprehensive in terms of the demands of the job, since it is clearly used for all types of work.

The court concludes that neither the two-page, fill-in-the-blank Work History Form nor Baruch's testimony based on that form constitute "substantial evidence" to support ALJ Kuperstein's decision that Mandro's past relevant work "as actually performed" was "light work."  The information available to ALJ Kuperstein was brief, conclusory, and incomplete.  Narrative answers were not required by the form and may have been precluded altogether.  While general exertional requirements (for example, lifting, sitting, and standing) were listed, specific information about Mandro's previous work was not captured.  That Baruch herself testified that she did not "feel comfortable saying that I definitely have enough information here" and that it would "be unfair for me to say that I'm sure that he was — what type of bus he was driving" supports this conclusion.  Id. at 90.  The court therefore agrees with Mandro that the finding that

---

[8] In the different form that the Commissioner cites as evidence that Mandro completed the Work History Report at page 422 of the record, Mandro's answer to the question "Why did you stop working?" was "Because of my condition(s)."  R. at 416.  Based on the other answers on the form, this appears to be an option from a drop-down menu, as opposed to an opportunity to provide a more descriptive explanation.

Mandro's prior relevant work was "light work" within his capacity was therefore inadequately supported.

Second, the court finds that ALJ Kuperstein erred in failing to consider driving limitations in crafting his residual functional capacity finding. Although Mandro does not raise this argument, the court is obligated to engage in a plenary review of the evidence in order to determine whether the ALJ's decision was supported by substantial evidence. See Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984). Here, there is no evidence in the record to support a finding that Mandro is still capable of driving. The fill-in-the-blank Work History Form does not include a section on driving, as a job requirement or a functional limitation. Neither, for that matter, does any of the medical evidence in the record address Mandro's capacity to drive. Not surprisingly, given that she only had access to the Work History Report, Baruch did not address Mandro's ability to drive, nor did ALJ Kuperstein ask Baruch a hypothetical question about whether Mandro could perform his past relevant work as actually performed if he was unable to drive. However, it does not take a vocational expert to conclude that, if Mandro cannot drive, he can no longer perform his work as a bus driver.

The only evidence in the record that directly addresses Mandro's capacity to drive is Mandro's own testimony at the January 2013 hearing before ALJ DiBicarro. There, as described above, Mandro testified that he had not driven in three years. Although he stated that he initially stopped driving because his license expired and he could not afford to pay the fee to have it renewed, he testified that, in the two years leading up to the January 2013 hearing, he was unable to drive and had stopped doing

so completely because he had started experiencing numbness in his feet. R. at 43–44.

He testified that "basically just getting in and out of the car sometimes and pushing

down with the foot with the diabetes, with the foot being numb, I wouldn't trust it right

now because sometimes at home I stepped on things and didn't realize. I had a

thumbtack in my foot and stuff like that and I didn't even feel it." Id. at 44.

Subsequently during the hearing, the following occurred:

> Atty: One of the things that your doctor is going on now, that you told us already, is that you don't have feeling in your feet and as a result of that you don't feel confident —
>
> Mandro: Yeah. That started —
>
> Atty: — about driving?
>
> Mandro: Yeah. That started coming on afterwards. That maybe didn't happen right away. It may have started as maybe around I would say last summer. Around August of 2012. It just started around the toes and now it's on the bottom of the feet. The bottom of the front of the feet.
>
> ALJ: You mentioned earlier like you did step on a tack and you wouldn't know?
>
> Mandro: Yeah. I actually stepped on a thumbtack and I was — I didn't even feel it. I looked at my foot and it was right in the — where the bottom of the big toe is. I looked and there's a thumbtack stuck. I saw blood and I pulled it out and I didn't even feel any pain associated with a cut or anything like that. I just —
>
> Atty: And that was last — when did that happen, that incident?
>
> Mandro: That was probably around late August of 2012. Then I told my doctor about the incident and he did say that that's very dangerous. He told me to make sure you always have something on your feet, you know, which I do.

Id. at 53–54. ALJ DiBicarro's Decision does not address whether he credited Mandro's

testimony with respect to foot numbness and, even if he had, ALJ Kuperstein would

have been under no obligation to adopt ALJ DiBicarro's finding.  What this testimony does demonstrate, however, is that the record that ALJ Kuperstein relied on was inadequate to provide a meaningful picture of Mandro's capacity to perform work as a bus driver, because ALJ Kuperstein did not have substantial evidence for his implicit finding that Mandro could still drive.  "Before determining that the plaintiff can perform his past work, the ALJ must review the plaintiff's residual functional capacity and the physical and mental requirements of the plaintiff's past employment."  Schaal v. Callahan, 993 F. Supp. 85, 94 (D. Conn. 1997); see Pagnani v. Comm'r of Soc. Sec., No. 1:12-CV-1287, 2014 WL 1268912, at *9 (N.D.N.Y. Mar. 26, 2014) ("Pursuant to both case law and [SSR] 82–62, in order to determine at step four whether a claimant is able to perform her past [relevant] work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities.") (quoting Kerulo v. Apfel, No. 98 CIV. 7315, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999)).  Given that Mandro's past relevant work was driving a bus, ALJ Kuperstein's inquiry should have included Mandro's capacity to drive.

It is possible that ALJ Kuperstein was not aware that Mandro had stopped driving, because, as noted above, see supra at 14–15, ALJ Kuperstein may have been unaware that the January 2013 hearing took place.  However, record evidence of which ALJ Kuperstein was aware reflects that Mandro was diagnosed with diabetic neuropathy.[9]  While the record is sparse on this subject—lacking, for example, details

---

[9] The Oxford Concise Medical Dictionary defines "diabetic neuropathy" as:

about the severity of Mandro's diabetic neuropathy and whether that would impact his capacity to drive—both Dr. Griffith's 2014 medical source statement and treatment records by Dr. Vitale, Mandro's podiatrist, note that Mandro was diagnosed with diabetic neuropathy.

ALJ Kuperstein does not mention that Dr. Griffith listed "peripheral neuropathy" as one of Mandro's diagnoses in his 2014 medical source statement. R. at 1403. However, ALJ Kuperstein did decide to give "little weight" to the 2014 medical source statement as a whole, as described in more depth above. Id. at 21. In support of ALJ Kuperstein's decision to give little weight to Dr. Griffith's report with respect to the peripheral neuropathy diagnosis in particular, Dr. Griffith's treatment notes through December of 2011 reflect a diagnosis of "type II diabetes . . . , without mention of complication." See, e.g., id. at 556–69. However, according to Mandro's January 2013 testimony, he began to experience diabetic neuropathy in August, 2012. That Dr. Griffith's 2012 medical source statement did not mention a diagnosis of peripheral neuropathy but his 2014 medical source statement did provides further support for this timeline. Together, Dr. Griffith's notes through December 2011, the two medical source statements, and Mandro's testimony at least raise a reasonable inference that Mandro began experiencing foot neuropathy in August of 2012 and was subsequently

---

progressive damage to the peripheral nerves seen in some people with long-standing diabetes. It most commonly affects the legs, causing pain or numbness working up from the feet. There is no cure but drugs can sometimes be used to control the discomfort experienced, and good blood glucose control may prevent deterioration over time.

Oxford Concise Medical Dictionary (9th ed. 2015) at 212.

In order to be consistent with the sources referenced, the court uses the terms "diabetic neuropathy," "end neuropathy," and "peripheral neuropathy" interchangeably. However, the court concludes, based on the record as a whole, that the variations in language used do not reflect different diagnoses, and that the neuropathy referenced throughout is diabetic neuropathy.

diagnosed with peripheral neuropathy as a complication of his type two diabetes.[10]

Dr. Vitale's records provide further corroboration for a diabetic neuropathy diagnosis. As ALJ Kuperstein notes in his Decision, treatment notes by Dr. Vitale from September 2012 state that Mandro had "early onset of mild diabetic neuropathy." Id. at 1415. Six months later, in March 2013, Dr. Vitale's treatment notes reflect that Mandro "does continue to have end neuropathy of both feet secondary to low back pathology and sciatic nerve pathology." Id. at 1412.

ALJ Kuperstein evidently discounted this evidence as "not supported by other records and . . . outside Dr. Vitali's [sic] area of expertise." Id. at 16. Furthermore, ALJ Kuperstein observed that "most examinations since January 24, 2010 rarely show any sensation deficits and no ongoing diagnosis of neuropathy is reflected until September 2012," and "there were no electromyography (EMG) studies or nerve conduction studies ordered." Id. There are several problems with this analysis. First, assuming that ALJ Kuperstein is correct that peripheral neuropathy is beyond the ken of a podiatrist to diagnose, the most logical conclusion to draw from Dr. Vitale's treatment notes is that another physician, most likely Dr. Griffith, had already diagnosed peripheral neuropathy. Therefore, the absence of records to support Dr. Vitale's diagnosis could well be remedied by obtaining Dr. Griffith's treatment notes since December, 2011

Similarly, with respect to EMG or nerve conduction studies, it is entirely plausible that such studies would be contained in the missing records from Dr. Griffith. Rosa, 168 F.3d at 80 ("[A] treating physicians' 'failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have

_____

[10] ALJ Kuperstein does not dispute Mandro's type II diabetes diagnosis, and it is well supported by the record evidence. R. at 16.

provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case.'") (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)).  Furthermore, even if no such studies were ever conducted, the court would still be loath to substitute the judgment of a layperson, such as the ALJ or this court, for the expertise of a trained and licensed physician who has been treating Mandro for years by asserting that, without these tests, a diagnosis of peripheral neuropathy is unreliable.  See id. at 79 (criticizing the ALJ's analysis for "improperly 'set[ting] [her] own expertise against that of' the treating physician") (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)).

Ultimately, ALJ Kuperstein's conclusion was that foot neuropathy was among several conditions which "were being managed medically, and should be amenable to proper control by adherence to recommended medical management and medication compliance."  R. at 16.[11]  This conclusion is entirely without support.  No treatment notes or medical source opinions suggest that Mandro can manage his foot neuropathy with medicine, or in any other way.  The modicum of record evidence on the subject suggests the opposite.  For example, Mandro's testimony that Dr. Griffith told him to always keep something on his feet is clearly a recommendation designed to limit the harms associated with foot neuropathy, not a medical therapy with the potential to reverse its effects, which suggests that Dr. Griffith did not view Mandro's diabetic neuropathy as a treatable condition.  In addition, Dr. Vitale's notes, which are focused on documenting the therapeutic effects of orthotic footwear for Mandro's plantar

---

[11] Without going into depth on Mandro's other conditions, the court notes that it is puzzled by ALJ Kuperstein's conclusion that several of Mandro's conditions were "being managed medically" when the record is missing almost four years of treatment notes from Mandro's treating physician.

fasciitis, repeatedly note progress with respect to the plantar fasciitis but make no suggestion that orthotic footwear or anything else has been helpful for the peripheral neuropathy. The only inference that can be made from Dr. Vitale's treatment notes is quite the opposite: that Mandro's foot neuropathy had worsened from "mild" to something more severe between September 2012 and March 2013.

Finally, the court notes that the ALJ failed to consider Mandro's work history in determining whether Mandro could perform his past relevant work "as actually performed." Uncontroverted record evidence shows that Mandro worked full-time as a bus driver for over ten years. Id. at 47 (Mandro's testimony); id. at 399 (earnings summary). During his January 2013 testimony, Mandro testified that he was fired from his job because he was unable to pass a physical examination. Id. at 51. He further testified that he had been suspended several times toward the end of his tenure with the company because he exceeded his sick day limit, despite providing his supervisors with documentation from physicians. Id. at 49–50. This trajectory of Mandro's career as a bus driver suggests that he was unable to perform the work at the time he was fired in 2007. Mandro's work history therefore casts further doubt on ALJ Kuperstein's conclusion that Mandro could perform his past relevant work "as actually performed."[12]

Having rejected Dr. Griffith's medical source statements and discounted Dr.

---

[12] The court notes that the phrase "as actually performed" is linguistically broad enough to encompass situations in which a claimant can do their past work as actually performed, but also got fired because of their actual work performance. In other words, the text of the standard does not explicitly condition the "as actually performed" standard on said performance being satisfactory. However, if the Social Security Administration barred disability benefits from anyone who could still perform their previous work at the level that got them fired, the "beneficent purposes" of the Social Security Act would be severely undercut. Echevarria, 685 F.2d 751, 755 (2d Cir. 1982). The court therefore concludes that the "as actually performed" standard does not encompass work performance that did not meet the employers' minimum expectations.

Vitale's treatment notes to the extent that they reflect impairment, ALJ Kuperstein was left with the reports from the consulting physicians. ALJ Kuperstein states that he "g[ave] great weight to the opinion of the State agency physicians at Reconsideration who found that the claimant could perform less than the full range of light exertional work, because subsequently received evidence is not inconsistent with this assessment." Id. at 20. However, ALJ Kuperstein cited only one of the two "State agency physicians" who submitted a report as to Mandro's residual functional capacity, Katherine Tracy, M.D., apparently ignoring the report of Farooz Golkar, M.D., who reached substantially different conclusions than Dr. Tracy.[13] More to the point, Dr. Tracy's report was dated January 13, 2012, and was based on medical records dated no later than 2011. Id. at 122. Dr. Tracy's report therefore does not fill the gap that otherwise exists in the record evidence.

In light of the sparse record with respect to both the actual demands of Mandro's past work and with respect to his residual functional capacity, particularly his ability to drive, the court concludes that ALJ Kuperstein's decision that Mandro was able to perform his past relevant work as actually performed was not supported by substantial evidence.

In reaching this conclusion, the court is mindful that the substantial evidence

_____

[13] ALJ Kuperstein cites two different exhibits, but they appear to be duplicates. See id. at 115–24; id. at 125–34. In any event, they are both signed by Dr. Tracy. Dr. Golkar did prepare a report for Mandro's application dated July 13, 2011, but ALJ Kuperstein did not rely on that report in his Decision. Id. at 97–104 (duplicated at id. 105–12). In fact, Dr. Tracy's and Dr. Golkar's opinions differed significantly with respect to Mandro's exertional capacities. Most notably, Dr. Golkar concluded that Mandro could occasionally lift fifty pounds and could frequently lift twenty-five pounds, id. at 101, while Dr. Tracy concluded that Mandro could occasionally lift twenty pounds and could frequently lift ten pounds. Id. at 121. Nevertheless, ALJ Kuperstein did not even mention Dr. Golkar's report in his Decision, much less attempt to resolve the discrepancies.

standard is "a very deferential standard of review," <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012), and that "[i]t is for the SSA, and not this court, to weigh the conflicting evidence in the record," <u>Schaal</u>, 134 F.3d at 504. However, the ALJ's error in this case was not an improper weighing of conflicting medical evidence, but an absence of medical evidence overall. <u>Rosa</u>, 168 F.3d at 80 ("By foregoing [opportunities to develop the facts], and by rejecting a treating physician's medical assessment without fully developing the factual record, the ALJ committed legal error."). The court therefore remands on this basis as well.

Because the court finds that neither ALJ Kuperstein's residual functional capacity determination nor his assessment of Mandro's past relevant work "as actually performed" were supported by substantial evidence, on remand the ALJ should develop the record on both subjects.

### D. Vocational Expert Testimony Regarding "Other Work"

Mandro also raised arguments with respect to Baruch's testimony about the availability of "other work." Specifically, Mandro asserts, "The Record is silent as to the source of the vocational witness's job incidence data; since there is no stated basis of the witness's testimony, it is not possible, therefore, to 'check the witness's work' even in the crudest form." Pl.'s Mem. (Doc. No. 20-2) at 19. Because ALJ Kuperstein decided the case at the fourth step of the analysis, the court does not address this arguments at length. However, the court notes that if, on remand, the ALJ reaches the fifth step of the analysis, the ALJ should ensure that the basis for the vocational expert's testimony is stated on the record, in order to ensure that, if the ALJ ultimately relies on that testimony, such reliance is warranted by "substantial evidence." <u>See</u> <u>Brault</u>, 683

F.3d at 450 (concluding, with respect to the basis for a vocational expert's testimony, that "evidence cannot be substantial if it is 'conjured out of whole cloth'") (quoting Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)).

## VI.    CONCLUSION

For the foregoing reasons, Mandro's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is **GRANTED** and the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 30) is **DENIED**.  The case is remanded to the Social Security Administration for further proceedings consistent with this Ruling.

In addition, there is a pending Motion for Extension of Time nunc pro tunc for the Commissioner to file her Motion for Judgment on the Pleadings on August 1, 2017, five days past the extended deadline of July 27, 2017.  See Mot. for Extension of Time (Doc. No. 29).  This Motion is the Commissioner's fifth such motion, and was filed after the court denied the Commissioner's fourth Motion for Extension of Time (Doc. No. 27) on the basis that the court had previously extended the deadline three times, had stated in granting the most recent Motion for Extension of Time that that would be the last extension granted, and that the Commissioner filed her fourth Motion for Extension of Time on the day of the deadline, in contravention of Rule 7(b)(3) of the Local Rules of Civil Procedure.  See Order (Doc. No. 27).  Given that the Commissioner's fifth Motion for Extension of Time is not objected to and, in the interest of justice, the Commissioner's fifth Motion for Extension of Time nunc pro tunc (Doc. No. 29) is hereby **GRANTED**.  Nevertheless, the court reiterates the sentiment expressed in its Order of July 28, 2017 (Doc. No. 27) that "heavy caseloads" are ordinarily not sufficient to state good cause for delay, and are never good cause to file a fifth motion for extension of

time, or to file a motion for extension of time fewer than three days in advance of the deadline in question.

**SO ORDERED.**

Dated at New Haven, Connecticut this 14th day of September, 2017.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge